# Legal and Practical Consequences of a Blockade of Cuba

The President has the power to establish a blockade of Cuba under the laws of the United States without further congressional action.

A blockade may be unilaterally established by the United States under international law but its establishment may be questioned within the Organization of American States and the United Nations. In addition, such a blockade could be regarded by Cuba and other Soviet Bloc nations as an act of war.

October 19, 1962

## MEMORANDUM[*]

This memorandum discusses the legality and practical consequences of a blockade of Cuba established unilaterally by the United States in response to the current buildup of a military potential in Cuba with clearly aggressive capabilities. It concludes that the President has the power to establish such a blockade under the laws of the United States without further congressional action; that it may be confined to surface vessels or include aircraft as well; that a blockade may be unilaterally established by the United States under international law but that its

---

[*] Editor's Note: This unsigned, unaddressed memorandum appears in the daybooks of the Office of Legal Counsel and was cited in *The President's Constitutional Authority to Conduct Military Operations Against Terrorists and Nations Supporting Them*, 25 Op. O.L.C. 188 (2001).

Prior to publishing the 2001 opinion, we consulted with officials at the Department of State to determine whether they had any record or evidence of authorship of this memorandum. Although they were unable to locate a copy of the memorandum itself, they pointed us to declassified records of a meeting held on October 19, 1962 (the same date as this memorandum) and attended by a number of top-level administration officials (including Secretary of State Dean Rusk, Attorney General Robert Kennedy, and National Security Advisor McGeorge Bundy). *See* U.S. Dep't of State, *Foreign Relations of the United States, 1961–1963: Volume XI, Cuban Missile Crisis and Aftermath*, doc. 31 (Edward C. Keefer et al., eds., 1998), *available at* http://history.state.gov/historicaldocuments/frus1961-63v11/d31 (last visited Aug. 3, 2012) (notes of October 19, 1962 meeting). These records suggest that the memorandum may have been prepared by Leonard Meeker, Deputy Legal Adviser for the Department of State, perhaps in consultation with Nicholas Katzenbach, Deputy Attorney General at the time and previously Assistant Attorney General for OLC. Mr. Meeker kept the notes that are collected in the declassified records of the October 19 meeting. According to Mr. Meeker, Mr. Katzenbach spoke first at the meeting and stated that "the President had ample constitutional and statutory authority to take any needed military measures." *Id.* Mr. Meeker recorded that "my analysis ran along much the same lines." *Id.*

Mr. Katzenbach's and Mr. Meeker's positions were thus consistent with that of this memorandum. They were also consistent with two other OLC opinions included in this volume—one signed by Robert Kramer, Assistant Attorney General for OLC, and addressed to Attorney General Kennedy (*Authority of the President to Blockade Cuba*, 1 Op. O.L.C. Supp. 195 (Jan. 25, 1961)); the other signed by Norbert Schlei, Assistant Attorney General for OLC, also addressed to Attorney General Kennedy (*Authority Under International Law to Take Action If the Soviet Union Establishes Missile Bases in Cuba*, 1 Op. O.L.C. Supp. 251 (Aug. 30, 1962)). This memorandum does not cite either of those opinions, however, which tends to suggest that it was not prepared by the Department of Justice.

establishment may be questioned within the Organization of American States ("OAS") and, perhaps, within the United Nations. In addition, it concludes that such a blockade could be regarded by Cuba and other Soviet Bloc nations as an act of war.

## I. The Legal Requirements of a Blockade

The most authoritative definition of blockade reads as follows:

> Blockade is the blocking by men-of-war of the approach to the enemy coast, or a part of it, for the purpose of preventing ingress and egress of vessels or aircraft of all nations. . . . Although blockade is . . . a means of warfare against the enemy, it concerns neutrals as well, because the ingress and egress of neutral vessels are thereby interdicted, and may be punished.

2 L. Oppenheim, *International Law: A Treatise* 768 (H. Lauterpacht ed., 7th ed. 1952).

Historically, blockade has been associated with belligerent nations as a measure of war.

While the practical effectiveness of a blockade may be influenced by the failure to interdict aircraft or, presumably, submarines, the legal effectiveness of a blockade is not affected by the failure to do so. *Id.* at 781. Thus, a blockade may be declared against shipping alone, or against shipping and aircraft.

The formal requirements of a blockade have to do with the manner in which it is established and its existence made known. The declaration must state the date on which a blockade begins and must make clear its geographical limits. In addition, it must satisfy three conditions: (1) it must be effectively maintained; (2) it must not bar access to ports and coasts of countries not included within its objectives; and (3) it must be applied impartially to the shipping of all nations.

The reasons for these conditions are clear. The state declaring the blockade must be able to make it effective against all shipping to the extent that the risk of running the blockade is clear and apparent. Otherwise, a so-called "paper blockade" would exist and amount to a mere license to commit haphazard acts of privateering. The element of danger must be clearly understood since, as a matter of law, any shipping which seeks to run a blockade is liable to seizure and eventual condemnation by the blockading state.

A blockade may exclude all shipping and, therefore, all cargoes from the blockaded state. Alternatively, the blockading state may declare only certain cargoes contraband.

## II. Blockade as an Act of War

There is a good deal of authority to the effect that a blockade assumes the existence of a state of war and that there is legally no such thing as a "pacific blockade" or "a blockade during time of peace." There are frequent statements by commentators that a blockade necessarily means war, or depends upon a pre-existing state of war, or in and of itself creates a state of war. The United States took such a position with respect to the Anglo-German Blockade of Venezuela in 1902, and again in 1919, with respect to the proposal that the Allied governments blockade Bolshevist Russia. Broad statements of this kind, however, require considerable qualification in the light both of history and of contemporary conditions.

### A. History

During the nineteenth century, a lawyer's distinction between war and peace grew up. Since international law was divided between that which existed in *peacetime* and that which existed in *wartime*, it became important to lawyers to attempt to make a clear distinction. For example, the law of the high seas in peacetime forbade one nation to stop the shipping of another, but during time of war freedom of the seas could be heavily circumscribed through rights of blockade and search and seizure.

In practice, states never observed the clear-cut distinction between war and peace which lawyers insisted must exist. Whenever a state had a limited objective in its use of force, it customarily refrained from declaring war, which implied all-out hostilities rather than limited action. Often these were referred to as "acts short of war," "hostile measures short of war," or "reprisals short of war." The lawyers, however, kept insisting that as a matter of strict logic there could be no such thing.

There are numerous examples. On several occasions, the United States used armed force to protect American property abroad against the will of the state involved without a declaration of war. One such instance was the bombardment and occupation of Vera Cruz, which Mexico insisted was an act of war, though the United States maintained that no state of war existed. Other states engaged in similar practices; Corfu is another famous example.

In 1902, the British engaged in a blockade of Venezuela as a measure to enforce the collection of a debt. The United States insisted that a blockade required a declaration of war and demanded that the British either cease the blockade or declare war on Venezuela. Eventually the British did, and only after they had done so did the United States recognize the legality of the blockade.

The declaration of a state of war was helpful in ascertaining the rights and obligations of neutrals in a given situation. Apart from this, however, it served little function. War itself, whatever its reason, was legal self-help, and so were lesser measures if such could be said to exist.

Whether or not a nation declared a state of war it would be found by others to exist if that state were claiming rights, such as blockade, normally associated with war. Therefore, it seems to me that legal doctrine to the effect that blockade requires a state of war is utterly tautological. Blockade is a right that existed only during war since it was doctrinally related to wartime rather than peacetime. One could deduce a state of war from the existence of a blockade. And one could not conceptually claim rights of blockade without acknowledging its relationship to war. Thus the declaration of war really had no significance apart from clarification that one was claiming the rights normally associated with blockade under international law rather than exceptional rights which would have been unprecedented interference with freedom of the high seas during peacetime.

Applied to the current situation, one could say that if the United States declared a blockade and asserted the rights with respect to neutrals normally associated with it, there would be no need to declare a state of war as well. Other states might insist, as we did in the case of Venezuela, that we declare a state of war, but it is difficult to see the significance of this insistence in any realistic terms should we refuse to do so. Alternatively, they could state that war existed by virtue of the fact that we have declared a blockade, whether we affirmed the state of war or not.

In the light of these facts, what we say with respect to the existence or nonexistence of a state of war is largely a political judgment. I would recommend, therefore, that if we declare a blockade, we simply claim all the rights a blockading nation would have if a state of war existed. This clarifies our position sufficiently for legal purposes. A number of states will say this amounts to a declaration of war against Cuba, but that could scarcely be avoided under any circumstances.

## B. Contemporary Conditions

In actuality the existence or non-existence of a state of war has always been a question of fact, not of law. If actual hostilities exist, then such parts of the law of war as treatment of prisoners, etc., exist irrespective of any formal declaration and irrespective of the legality or illegality of the hostilities themselves. Moreover, the distinction between war and peace, as it existed in the nineteenth century, has limited application today. Various acts are made unlawful by the U.N. Charter, a sharp distinction from the nineteenth century view that war was itself a lawful prerogative of states. The significance, therefore, from a legal point of view of a declaration of war is less important, since it does not make acts in violation of the Charter lawful.

One pertinent example of this state of affairs is the blockade of shipping instituted by Egypt against Israel. Egypt sought to invoke its declared state of war with Israel as a justification for the blockade. The Security Council, without questioning or commenting upon the existence of a state of war, declared the blockade to be unlawful under the Charter.

The legality today of a blockade unilaterally imposed by one state upon another depends upon its compatibility with the language and principles of the Charter. Ordinarily it, like other measures involving force, is reserved to the United Nations or to regional organizations such as the OAS. If imposed unilaterally without prior approval it must be considered a reasonable measure under the circumstances, proportional to the threat posed, and limited to a legitimate purpose. It does not become more or less lawful on the basis of declaration of war or a failure to declare war.

The irrelevancy of a declaration of war is further supported by the fact that institution of a blockade is a measure granted expressly to the United Nations and by inference to the OAS under their respective charters, but nothing is said about the right of these organizations to declare war. In point of fact, the United Nations authorized a blockade in the Korean "police action" and claimed all of the usual legal incidents of a blockade during a state of war. War, of course, was not declared by the United Nations or by nations participating.

### III. Presidential Authority to Declare a Blockade

Both practice and authority support the proposition that the President, in the exercise of his constitutional power as Commander in Chief, can order a blockade without prior congressional sanction and without a declaration of war by Congress. President Lincoln took such action in 1861, and his authority was sustained by the Supreme Court in the *Prize Cases*. 67 U.S. (2 Black) 635 (1862). While the Supreme Court there found, in accordance with the doctrine discussed above, that a state of war existed as a matter of fact and as a result of the proclamation by the President of a blockade, the Court did not suggest that the President was remiss in failing to seek a declaration of war from Congress.

On April 20, 1898, a joint resolution of Congress directed the President to use the land and naval forces of the United States to compel the Government of Spain to relinquish its authority over Cuba. Pub. Res. No. 55-24, 30 Stat. 738. In accordance with this resolution, President McKinley, on April 22, issued a proclamation instituting a naval blockade of Cuba. 14 *Compilation of the Messages and Papers of the Presidents* 6472 (James D. Richardson ed., 1909). Subsequently, Congress declared that a state of war existed and that such state had existed since prior to the proclamation. Pub. L. No. 55-189, 30 Stat. 364 (Apr. 25, 1898). But it is clear that the President did not depend upon any congressional declaration of war, or even upon a future ratification of his proclamation, when he issued it.

Finally, President Truman, in 1950, issued an order blockading Korea. He stated that he did so in keeping with the Security Council's request for support, but he did not then seek congressional authorization for the act, nor did he seek a declaration of war. White House Statement Following a Meeting Between the President and Top Congressional and Military Leaders to Review the Situation in Korea, *Pub. Papers of Pres. Harry S. Truman* 513 (1950).

I believe with or without the congressional resolution of October 3, 1962, Pub. L. No. 87-733, 76 Stat. 697, the President could declare a blockade of Cuba, and it is doubtful if Congress could circumscribe this right. The instant resolution, however, tends to support the proposed action, and thus serves a purpose analogous to that of the 1898 Resolution and the 1950 action of the Security Council.

It should be noted that even if one were to assume that international law requires a state of war to exist before one can invoke the right of blockade, this international rule is not pertinent to the President's authority under the Constitution. There are numerous examples of American Presidents taking measures which could internationally be regarded as acts of war without first seeking congressional authority. And no foreign state could argue that a state of war did or did not exist because American constitutional procedures were or were not followed in a particular instance.

## IV. Unilaterally Declared Blockade Under the U.N. Charter

The most difficult legal problem is to justify a unilateral declaration of blockade in the face of the U.N. Charter. The Charter appears to reserve to the United Nations, or to regional organizations, most measures involving the use of force. But, at the same time, it explicitly precludes the use of force only against the "territorial integrity" or "political independence" of another state (Article 2), and even this is qualified by recognizing the right of a state to act in self-defense (under Article 51) against an armed attack. In addition, the Charter forbids other actions which breach the peace or are inimical to the purposes of the United Nations.

Three justifications of a unilateral blockade are possible: (1) self-defense; (2) that it is necessary to preserve the peace; and (3) that it is not forbidden by the Charter.

Self-defense is a difficult argument in view of the requirement for an "armed attack." Some writers, however, take the realistic view that a state need not wait so long if, in fact, to do so would so jeopardize its security position as to render it helpless.

An easier argument, in my judgment, is to assert the right to preserve the peace by acting in an emergency on behalf of a regional organization, promptly submitting the matter to the organization for ratification. Acting without prior approval could be justified on the basis of urgency and lack of time. In the case of U.S. action against Cuba it could be further bolstered by prior findings of the organization and the long history of U.S. protection of Latin America against threats of foreign domination.

This latter argument would be difficult to maintain if the United States were actually to mount an assault on Cuba. But a blockade is not an action which is irreversible if subsequently it fails of ratification, and is correspondingly more defensible as a unilateral step.

The third argument in justification is closely related to the second. I believe one could successfully contend that a state has the right unilaterally to prevent a change in the status quo adverse to its security and itself a threat to the peace pending action by the OAS (or United Nations), provided the action it takes is essentially non-violent and designed to protect rather than irrevocably change the pre-existing situation. This, of course, would be true of blockade. Thus, until the OAS either supported or renounced the U.S. blockade, I believe we would be justified in maintaining it as a measure preserving a pre-existing state of affairs and preventing a situation which might require more drastic action to overturn or even lead to full-scale war.

### V. Blockade and Marine Insurance

The effect of a blockade on marine insurance can be viewed from several standpoints. First, from the standpoint of the blockading state it is illegal for insurance companies to write insurance on cargoes destined to the ports of the blockaded state. This would, of course, under the historic view be prohibited trading with an enemy. On the other hand, it would not be illegal for an English insurance company to write policies on cargoes destined to a blockade country where England was not the blockading state. *See* 2 Joseph Arnould, *Arnould on the Law of Marine Insurance and Average* § 760, at 681 (Robert S. Chorley ed., 14th ed. 1954). As a practical matter, however, it is obvious that British companies will not write policies on cargoes destined to Cuba because of the risk of loss involved.

A second insurance problem relates to neutral ships on the high seas bound for a blockaded port before the institution of the blockade or caught in such a port with a cargo taken on before the blockade has been instituted. This situation involves the application of the usual clause in marine insurance policies covering loss arising from "arrests, restraints, and detainments of all kings, princes, and people of what nation, condition, or quality whatsoever." Under American law, this clause protects a neutral vessel in the situation described. *Olivera v. Union Ins. Co.*, 16 U.S. (3 Wheat.) 183 (1818) (Marshall, C.J.); *Vigers v. Ocean Ins. Co.*, 12 La. 362 (1838). Apparently this is also the law in continental European countries. On the other hand, in England "it has been repeatedly decided, and must now be taken as clear insurance law, that neither interdiction of trade at the port of destination after risk commenced, nor interception of the voyage by blockade, or by the imminent and palpable danger of capture or seizure, amounts to a risk for which English underwriters are answerable under the common form of policy, either as an 'arrest, restraint, and detention,' or in any other way whatever." 2 Arnould, *Marine Insurance* § 804, at 727.